UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

PEOPLE FOR THE ETHICAL TREATMENT        §
OF ANIMALS,                             §
                                        §
    *Plaintiff*,                          §
                                        §
v.                                      §        CIVIL ACTION H- 20-3681
                                        §
SHANE HINCKLEY,                         §
                                        §
    *Defendant*.                         §

## MEMORANDUM OPINION AND ORDER

Pending before the court is a motion to dismiss filed by defendant Shane Hinckley. Dkt. 10. After considering the motion, response, reply and applicable law, the court is of the opinion that the motion should be DENIED.

## I. BACKGROUND

This is a freedom of speech case. The plaintiff, People for the Ethical Treatment of Animals, Inc. ("PETA"), attempted to have an advertisement placed on buses that were part of the Texas A&M University ("TAMU") transit system. Dkt. 1. It sent the advertisement to TAMU's advertising coordinator on October 9, 2019, and requested that the advertisement run in either October or November of 2019. *Id.* The proposed advertisement includes a photo of a thin and drooling golden retriever in a cell and reads: "Imagine having your body left to science while you're still in it. PETA.org." *Id.*; Dkt. 16, Walters Dec., Ex. 1. Six weeks after PETA requested to run the advertisement, Shane Hinckley, the Vice President of Brand Development for TAMU and the defendant in this lawsuit, rejected the proposed advertisement because it violated TAMU's advertisement standards prohibiting "political campaigns and viewpoints or endorsements." Dkt. 1. PETA contends that the proposed advertisement does not contain a political campaign,

viewpoint, or endorsement and instead was meant to educate the public about dogs who were suffering in TAMU's canine muscular dystrophy laboratory. *Id.* Moreover, PETA asserts that the policy of not allowing "political campaigns and viewpoints or endorsements" violates the First Amendment both facially and as applied to PETA's proposed advertisement. *Id.*

On October 27, 2020, PETA filed this lawsuit. *Id.* PETA asserts First and Fourteenth Amendments causes of action under 42 U.S.C. § 1983 because (1) TAMU's advertisement policy is unconstitutional facially and as applied to PETA; (2) the policy is vague in that it is not clearly defined such that a person of ordinary intelligence can readily determine whether an advertisement is allowable or prohibited; and (3) it is overbroad because it provides TAMU with unfettered discretion to interpret "political" in a way that renders a substantial number of its applications unconstitutional. *Id.* PETA seeks declaratory relief and an injunction. *Id.*

Hinckley moves to dismiss PETA's complaint, arguing that under *Lehman v. City of Shaker Heights*, 418 U.S. 298, 304, 94 S. Ct. 2714 (1974), TAMU may exclude political advertisements on its public transit systems. Dkt. 10. He notes that TAMU has "long prohibited political advertisements in its transit system, regardless of viewpoint," and that this prohibition is only one category of the fourteen exclusions in its advertising policy. *Id.* (citing Dkt. 1 (providing link to the standards, which include the category "political campaigns and viewpoints or endorsements") and Dkt. 10, Ex. A (the standards)). Hinckley asserts that the proposed advertisement in this case is part of a public campaign to target TAMU's muscular dystrophy laboratory. *Id.* (citing *PETA v. Young*, No. 4:20-cv-02913 (S.D. Tex.) (Hanks, J.), a lawsuit alleging that TAMU deleted comments about the experiments in the muscular dystrophy lab made by PETA-affiliated individuals as part of PETA's "anti-cruelty campaign"; the comments were made during live-streamed graduation ceremonies). Hinckley argues that TAMU's policy is not vague or overbroad

and that PETA's constitutional challenges fail because the policy is reasonable in light of the forum's purpose and does not constitute viewpoint-based censorship. *Id.*

PETA asserts that Hinckley's involvement reflects TAMU's desire to exclude PETA's viewpoint because it is critical of the university's canine laboratory, noting that Hinckley was not even the official who typically made decisions about advertisements and instead was in charge of TAMU's "reputation campaign." Dkt. 16. PETA contends that categorical bans on "political" speech in forums similar to the TAMU transit system have been held to be unconstitutional because they confer unbridled discretion on officials and invite viewpoint discrimination. *Id.* (citing *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018)). It asserts that TAMU's policy is not capable of reasoned application and does not provide adequate safeguards against viewpoint discrimination. *Id.* It also argues that TAMU's reliance on *Lehman* is misplaced because the U.S. Supreme Court's 2018 decision in *Minnesota Voters Alliance v. Mansky* and cases applying it "have cast serious doubts on *Lehman*'s continued validity in this area of law." *Id.* Moreover, PETA asserts that even if the court were to uphold the broad prohibition on political advertisements as legitimate, TAMU failed to apply the policy in a viewpoint neutral way here. *Id.* Additionally, according to PETA, the policy does not meet the requirements of the Due Process Clause because it is so vague that it leaves the public uncertain as to what exactly it prohibits. *Id.*

In reply, Hinckley reiterates his argument that *Lehman*, not *Mansky*, applies. Dkt. 21. He argues that *Lehman* is directly on point, that *Mansky* did not directly overturn *Lehman*, and that reading *Mansky* in the manner in which PETA suggests would be "unworkable" and would "jeopardize long-standing First Amendment precedents, infringe on the government's ability to control speech in its nonpublic forums, and ultimately restrict—not enhance—the right to free speech." *Id.* With regard to *Lehman*, Hinckley points out that the court cannot simply ignore

directly-on-point precedent because the Fifth Circuit is a strict stare decisis court. *Id.* (citing *Nat'l Coal. for Men v. Selective Serv. Sys.*, 969 F.3d 546, 549 (5th Cir. 2020)). He also argues that even if *Mansky* applies, PETA's claim still fails because here there is no broad ban coupled with a "haphazard interpretation" of the policy as in *Mansky*. *Id.* Rather, this policy bans ads with a "political viewpoint," which requires the official to determine if the ad relates to a government or the conduct of a government and take a discernible stance on the subject. *Id.*

The motion is now ripe for disposition. The court will first set forth the applicable legal standards and then discuss whether PETA has stated a claim under those standards.

## II. LEGAL STANDARDS

### A.    Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007). In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The supporting facts must be plausible—

enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.

### B.   *Ex Parte Young*

Public officials sued in their official capacity are protected by the Eleventh Amendment, which bars suits by private citizens against a state in federal court, unless the Eleventh Amendment is shown not to apply or the *Ex parte Young* exception applies. *K.P. v. LeBlanc*, 627 F.3d 115, 124 (5th Cir. 2010). "The *Young* exception is a legal fiction that allows private parties to bring 'suits for injunctive or declaratory relief against individual state officials acting in violation of federal law.'" *City of Austin v. Paxton*, 943 F.3d 93, 997 (5th Cir. 2019) (quoting *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013)). This exception only applies if the state officer "by virtue of his [or her] office" has "some connection with the enforcement of the [challenged] act, or else [the plaintiff] is merely making him [or her] a party as a representative of the state, and thereby attempting to make the state a party." *Ex parte Young*, 209 U.S. 123, 157, 29 S. Ct. 441 (1908). Courts attempting to establish whether the exception applies must inquire "into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *City of Austin*, 943 F.3d at 998 (cleaned up). If a particular individual or agency is statutorily tasked with enforcing the challenged law, then the named defendant must be the person contemplated by the statute. *Id.* (noting that the defendant in that case, Attorney General Paxton, had statutory authority to enforce the law being challenged). Hinckley does not dispute, at least at this stage, that *Ex parte Young* applies.

### C.      First Amendment

The First Amendment to the U.S. Constitution, which applies to the States through the Due

Process Clause of the Fourteenth Amendment, states:

> Congress shall make no law respecting an establishment of religion,
> or prohibiting the free exercise thereof; or abridging the freedom of
> speech, or of the press; or the right of the people peaceably to
> assemble, and to petition the government for a redress of grievances.

U.S. Const. amend. I; *see* U.S. Const. amend. XIV, § 1 (prohibiting states from depriving "any

person of life, liberty, or property, without due process of law"); *Douglas v. City of Jeannette*, 319

U.S. 157, 162, 63 S. Ct. 877 (1943) ("We have repeatedly held that the Fourteenth Amendment

has made applicable to the states the guaranties of the First.").  The U.S. Supreme Court has,

however, permitted certain restrictions of the freedom of speech, which depend on the forum in

which the speech is expressed.  The three main types of forums are (1) traditional public forums;

(2) designated public forums; and (3) nonpublic forums.  *Mansky*, 138 S. Ct. at 1885.  In some

cases, the U.S. Supreme Court and other courts recognize a fourth type of forum: a limited public

forum.  *See Walker v. Tex. Div., Sons of Confederate Vets., Inc.*, 576 U.S. 200, 215, 135 S. Ct.

2239 (2015) (explaining that "Texas's specialty plates are neither a designated public forum . . .

nor a limited public forum" (cleaned up)); *see also Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017);

*Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 345–46 (5th Cir. 2001) (noting that it "has not been

clear whether the terms [designated public forum and limited public forum] could be used

interchangeably to describe the middle tier of forum, or in fact described different types of

forums").

Traditional public forums include parks, streets, and sidewalks, and "the government may

impose reasonable time, place, and manner restrictions on private speech, but restrictions based on

content must satisfy strict scrutiny, and those based on viewpoint are prohibited."  *Mansky*, 138 S.

Ct. at 1885.  Designated public forums are places that are not traditionally considered public forums but have intentionally been opened up for that purpose, and the same standards apply as in traditional public forums.  *Id.*  A limited public forum is a forum that the government has reserved for certain groups or the discussion of certain topics.  *Walker*, 576 U.S. at 215.  "[A] government entity may impose restrictions on speech that are reasonable and viewpoint neutral" in a limited public forum.  *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 470, 129 S. Ct. 1125 (2009). In a nonpublic forum, which is "'not by tradition or designation a forum for public communication,'—the government has much more flexibility to craft rules limiting speech" than it does in traditional and designated public forums.  *Mansky*, 138 S. Ct. at 1885 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46, 103 S. Ct. 948 (1983)).  The government may reserve a nonpublic forum "for its intended purposes . . . as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."  *Id.*  The government thus "may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy."  *Id.* at 1885–86.

In its first cause of action, PETA challenges TAMU's policy banning advertisements that relate to "political campaigns and viewpoints or endorsements" as unconstitutional on its face and as applied to PETA.  Dkt. 1.  "Facial and as-applied challenges have different substantive requirements."  *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014). As as-applied challenge is to the statute or regulation's application of the plaintiff's "own expressive activities."  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 803, 104 S. Ct. 2118 (1984).  A "facial challenge" under the First Amendment, which may be a challenge to overbreadth or vagueness of a law, "means a claim that the law is 'invalid *in*

*toto*—and therefore incapable of any valid application.'" *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 & n.5, 102 S. Ct. 1186 (1982) (citations omitted)).  "A court can hold a statute to be facially unconstitutional, as opposed to unconstitutional 'as applied,' if it is excessively vague or substantially overbroad." *Hersh v. United States ex rel. Mukasey*, 533 F.3d 743, 762 (5th Cir. 2008).

**D.    Vague**

PETA's second cause of action is that the policy is unconstitutionally vague.  Dkt. 1.  "It is established that a law fails to meet the requirements of the Due Process Clause if it is so vague that it leaves the public uncertain as to the conduct it prohibits or leaves judges and jurors free to decide, without any legally fixed standards, what is prohibited and what is not in each particular case." *Giacco v. State of Pennsylvania*, 382 U.S. 399, 402–03, 86 S. Ct. 518 (1966).  Persons of "common intelligence" must not be left to guess at the meaning.  *Women's Med. Ctr. of Nw. Hous. v. Bell*, 248 F.3d 411, 421 (5th Cir. 2001).  "The doctrine incorporates notions of fair notice or warning." *Smith v. Goguen*, 415 U.S. 566, 572, 94 S. Ct. 1242 (1974).  "A facial challenge for vagueness is appropriate only on an allegation that the law is vague not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." *Ferguson v. Estelle*, 718 F.2d 730, 735 (5th Cir. 1983) (cleaned up).  "'[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'" *Mansky*, 138 S. Ct. at 1891 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794, 109 S. Ct. 2746 (1989)).  However, "[i]t is 'self-evident' that an indeterminate prohibition carries with it '[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation.'" *Id.* (quoting *Bd. of Airport*

*Comm'rs of City of L.A. v. Jews for Jesus*, 482 U.S. 569, 576, 107 S. Ct. 2568 (2018)).  Any discretion in the prohibition "must be guided by objective, workable standards."  *Id.*

## E.    Overbroad

PETA's third cause of action is that the policy is overbroad.  Dkt. 1.  The overbreadth doctrine "was designed as a 'departure from traditional rules of standing,'" . . . to enable persons who are themselves unharmed by the defect in a statute nevertheless 'to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'"  *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 484, 109 S. Ct. 3028 (1989) (citations omitted).  The doctrine, however, may also be invoked if the plaintiff has standing to challenge the statute on other grounds but the challenge on other grounds fails.  *Id.*  It is best, however, to proceed with the overbreadth challenge only after considering the as-applied challenge.  *Id.* at 485.  "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society—to prevent the statute [or policy] from chilling the First Amendment rights of other parties not before the court."  *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958, 104 S. Ct. 2839 (1984).  The "overbreadth doctrine is not casually employed."  *L.A. Police Dep't v. United Reporting Publ'g Corp.*, 528 U.S. 32, 39, 120 S. Ct. 483 (1999).  In fact, the U.S. Supreme Court considers it to be "strong medicine" and applies it "only as a last resort."  *Id.* (citations and quotations omitted).  "The first step in overbreadth analysis is to construe the challenged statute."  *United States v. Williams*, 553 U.S. 285, 293, 128 S. Ct. 1830 (2008).  "A law implicating the right to expression may be invalidated on a facial challenge if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'"  *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 387 (5th Cir. 2013) (quoting *United States v. Stevens*, 559 U.S. 460, 472, 130 S. Ct. 1577 (2010)).

### III. ANALYSIS

Hinckley's motion to dismiss is based primarily on a 1974 decision of the U.S. Supreme Court that he contends is directly on point and has not been overruled, and he argues that this court therefore must follow the holding in that case. PETA relies on a 2018 U.S. Supreme Court decision that cites the 1974 case favorably but reaches a different conclusion than the 1974 case. "The Fifth Circuit is a 'strict stare decisis' court and 'cannot ignore a decision from the Supreme Court unless directed to do so by the Court itself.'" *Nat'l Coal. of Men*, 969 F.3d at 549. This court is likewise bound by decisions issued by both the U.S. Supreme Court and the Fifth Circuit. In order to determine if the court must, as Hinckley argues, blindly follow the holding in the 1974 case or if it should, as PETA argues, look to the 2018 case for further guidance on how to analyze First Amendment cases, the court will examine both cases and determine how they are similar and how they are different from the case at hand and whether the holdings can be reconciled under the facts alleged in PETA's complaint. It will then discuss the parties' arguments as they relate to each of PETA's claims and determine whether PETA's claims are plausible under the applicable law.

### A.    Caselaw

#### 1.    *Lehman*

Hinckley asserts that *Lehman* is directly on point. Dkt. 10. In *Lehman*, three justices joined Justice Blackmun in the plurality opinion. Justice Douglas wrote a concurring opinion, and Justice Brennan wrote a dissent that was joined by three justices. *See generally Lehman*, 418 U.S. 298. "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.'" *Marks v. United States*, 430 U.S. 188, 193, 97 S. Ct. 990 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15, 96 S.

Ct. 2909 (1976) (Stewart, Powell, and Stevens, JJ.)).   The court thus begins by discussing Douglas's concurrence.

The petitioner in *Lehman* was a candidate for state office, and he attempted to purchase space for a paid political advertisement on car cards on the Shaker Heights Rapid Transit System ("SH Transit").   *Lehman*, 418 U.S. at 305 (Douglas, concurring).   The advertising agent for SH Transit refused the advertisement because it could not accept political advertisements.   *Id.*   In the lawsuit, the petitioner asserted that the city of Shaker Heights had turned the buses into free speech forums by allowing advertisements on the buses and that it therefore could not prohibit the type of speech.   *Id.*   While the plurality opinion reasoned that the city had created a "forum for communication" when it allowed advertisements, Justice Douglas noted that "a streetcar or bus is plainly not a park or sidewalk or other meeting place for discussion, any more than is a highway. It is the only way to get to work or back home.   The fact that it is owned and operated by the city does not without more make it a forum."   *Id.* at 305–06.   He noted that the buses were more like highway billboards, "which have long been used to display an array of commercial and political messages," which states could regulate under the Highway Beautification Act of 1965.[1]   *Id.* at 306.   He also reasoned that turning "a bus or streetcar into either a newspaper or a park" would mean taking "great liberties with people who because of necessity become commuters and at the same time captive viewers or listeners."   *Id.* at 306–07.   He pointed out that the Court must also consider the constitutional rights of commuters, and the petitioner had "no right to force his message upon an audience incapable of declining to receive it."   *Id.* at 307.   This was based on the

---

[1] The Highway Beautification Act of 1965 "limited billboards along highways and promoted landscaping efforts along the highways."   Ashlee A. Paxton, *Changing the First Lady's Mystique: Defining the First Lady's Legal Role and Upending Gender Norms*, 13 U. Mass. L. Rev. 2, 27 (2018).   The first lady at the time, Lady Bird Johnson, exerted some influence over environmental policy during her husband's presidency, and the bill that became the Highway Beautification Act was known as "Lady Bird's bill."   *Id.* at 27–28.

commuters' right "to be free from forced intrusions on their privacy." *Id.* Justice Douglas felt the content was not relevant because commercial advertisements may also be as offensive and intrusive as a political message. *Id.* The concurrence was based solely on the determination that the petitioner did not have a "constitutional right to spread his message before this captive audience." *Id.*

While the concurrence appears to substantially narrow the extent to which the reasoning in the plurality opinion is binding, the Fifth Circuit often has considered the reasoning in the *Lehman* plurality opinion when deciding First Amendment issues. *See Campbell v. St. Tammany Parish Sch. Bd.*, 231 F.3d 937, 940 (5th Cir. 2000) (noting that under *Lehman* "a city government had the prerogative to exclude political advertising, even though it generally allowed commercial advertising on city busses" (citing the plurality opinion)); *Estiverne v. La. State Bar Ass'n*, 863 F.2d 371, 378 (5th Cir. 1989) (interpreting *Lehman* as holding that the city of Shaker Heights "did not create a public forum in the 'car cards' in its public transportation system where access to the cards had been limited to nonpolitical advertising"); *SDJ, Inc. v. City of Houston*, 837 F.2d 1268, 1278 (5th Cir. 1988) (relying on the plurality in *Lehman* to support the assertion that "[g]overnments have the right to regulate and limit the content of advertisements within reason"); *Dall. Ass'n of Cmty. Orgs. for Reform Now v. Dall. Cnty. Hosp. Dist.*, 656 F.2d 1175, 1180 (5th Cir. 1981) (stating that in *Lehman* the Court "stated the Constitution did not require that display cases in public hospitals become public forums open to every would-be pamphleteer and politician" (relying on the plurality opinion)). Thus, while many aspects of the plurality opinion that are not also adopted by the concurring justice are not binding under *Marks*, the discussion in the plurality is in the very least highly persuasive. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 81, 107 S. Ct. 1637 (1987) ("As the plurality opinion in *MITE* did not represent the views

of a majority of the Court, we are not bound by its reasoning." (footnote omitted)); *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013) ("The reasoning of a Supreme Court opinion that does not command a majority vote is not binding precedent.").

In the plurality opinion, Justice Blackmun noted that a unanimous U.S. Supreme Court upheld a State of Utah law making it a misdemeanor to advertise cigarettes on billboards, street cars, and street car signs or placards in *Packer Corp. v. Utah*, 285 U.S. 105, 110, 52 S. Ct. 273 (1932). *Lehman*, 418 U.S. at 302. He pointed out that in *Packer* the Court had determined that the streetcar audience was a captive audience there by "'necessity . . . not choice'" and the "'legislature may recognize degrees of evil and adapt its legislation accordingly.'" *Id.* He instructed that "American constitutional jurisprudence . . . has been jealous to preserve access to public places for purposes of free speech, [but] the nature of the forum and the conflicting interests involved have remained important in determining the degree of protection afforded by the Amendment to the speech in question." *Id.* at 302–03. He determined that the "city transit system has discretion to develop and make reasonable choices concerning the type of advertising that may be displayed in its vehicles" though "the policies and practices governing access to the transit system's advertising space must not be arbitrary, capricious, or invidious." *Id.* at 303.

Justice Blackmun noted that the city made its decision based on pecuniary interest much like it would decide to impose a certain fare or change bus stop locations, and allowing political advertisements would (1) jeopardize long-term advertisement revenue because the city would be forced to allow short-term political ads; (2) subject users "to the blare of political propaganda"; and (3) possibly cause "lurking doubts about favoritism" related to "parceling out limited space to eager politicians." *Id.* Thus, a decision to limit space "to innocuous and less controversial commercial and service oriented advertising" served a "reasonable legislative objective" and did

13

not violate the First Amendment. *Id.* at 304. Justice Blackmun reasoned that if the Court were to hold that the petitioner had a right to political adverting on buses, "display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician." *Id.* Under the plurality opinion, there simply was "[n]o First Amendment forum" and the "city consciously . . . limited access to its transit system advertising space in order to minimize chances of abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Id.*

Hinckley argues that *Lehman* is directly on point. Dkt. 16. Indeed, there are many similarities between the facts alleged in the instant complaint and in *Lehman*. Both involve advertisements that the petitioner sought to place on a transit system operated by a governmental agency. And both advertisements were rejected because they were deemed to be "political" advertisements.

There are, however, important distinctions between the facts of this case and the facts in *Lehman*. First, in *Lehman*, there was a trial in the district court, which resulted in an evidentiary record; the testimony indicated that SH Transit "had not accepted or permitted any political or public issue advertising on its vehicles" in 26 years. 418 U.S. at 301. Here, the case is merely in its beginning stages and no evidentiary record has been developed. Thus, the court has no way of knowing whether TAMU has allowed other advertisements that would fall under the definition of "political viewpoint" it espouses for this case. Second, the *Lehman* policy said that the company in charge of the car cards could not "place political advertising in or upon any of the said CARS." *Id.* at 300. Instead, the company "accepted ads from cigarette companies, banks, savings and loan associations, liquor companies, retail and service establishments, churches, and civic and public-service oriented groups." *Id.* Here, PETA arguably could be considered one of the types of groups

14

from which the *Lehman* transit system would have accepted ads.  Third, the advertisements presented in *Lehman* and this case, while both deemed "political" by the governmental units at issue, are very different.  In *Lehman*, the petitioner sought to place an advertisement "to promote his candidacy" for state representative by purchasing car card space that contained his photo and the text: "Harry J. Lehman is Oldfashioned! About Honesty, Integrity and Good Government! State Representative—District 56."  *Id.* at 299.  This appears to be a typical—for that time period—political campaign advertisement for a person running for office.  As the *Lehman* Court noted, one of the problems with ads like this would be that it would only be short-term during the person's candidacy, which could jeopardize the ability to secure more long-term advertising clients due to limited space.  *Id.* at 304.  Additionally, "[t]here could be lurking doubts about favoritism" and "sticky administrative problems might arise in parceling out limited space to eager politicians." *Id.*  Here, the advertisement is not a traditional political campaign advertisement.  Instead, it could be characterized as a critique of TAMU's policy of performing multiple sclerosis testing on dogs. While it was only slotted to run short-term, it could theoretically produce a source of income for TAMU's transit system as long as TAMU's muscular dystrophy laboratory continues to perform its tests on dogs.  And it is unlikely that allowing PETA's advertisement would cause transit customers to believe TAMU favors PETA over other advocacy groups or over the muscular dystrophy laboratory, for that matter, though it is possible that discovery will reveal otherwise. But, at this stage of the litigation, the *Lehman* plurality's concerns about short-term ads and favoritism concerns do not seem to apply.

2.    *Mansky*

When the U.S. Supreme Court issued its decision in *Mansky* in 2018, which was written by Chief Justice Roberts and joined by six other Justices, it did not overrule *Lehman*.  In fact, it cited the plurality and concurring opinions in *Lehman* favorably in a string cite to support the proposition that the Court had "long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." 138 S. Ct. at 1885–86.  The Court held, however, that the State of Minnesota's ban on political apparel in the interior of a polling place violated the Free Speech Clause of the First Amendment because the law was not "capable of reasoned application." *Id.* at 1892.  Under Minnesota's law, voters could not wear a "political" badge, button, or insignia inside a polling place on Election Day.  *Id.* at 1882.  If a person did wear a prohibited item, the election judge at the polling place would ask the person to conceal or remove it; if the individual refused, he or she could still vote but may have been required to undergo an administrative process and, if found in violation, was potentially subjected to a reprimand, civil penalty, or prosecution for a petty misdemeanor resulting in a maximum penalty of $300.  *Id.*

The U.S. Supreme Court noted that all States "have laws curbing various forms of speech in and around polling places on Election Day."  *Id.* at 1883.  In Minnesota in 2010, the Minnesota Voters Alliance and various individuals filed a lawsuit in federal district court challenging Minnesota's political apparel ban, and the district court denied their request for a temporary restraining order on the ban so that they could wear buttons that said "Please I.D. Me" in response to Minnesota's lack of Voter ID and a "Tea Party Patriots" shirt.  *Id.* at 1884.  In response to the lawsuit, Minnesota counties distributed guidance to election judges that provided examples of apparel that fell within the ban.  *Id.*  On election day, a voter was asked to cover up his Tea Party

shirt and another to conceal his "Please I.D. Me" button, and one voter wearing the button and a T-shirt that said "Don't Tread on Me" and included the Tea Party logo, was turned away from the polls twice and then finally permitted to vote, though the judge recorded his information.  *Id.*  In the court case, the plaintiffs argued that the ban was unconstitutional both on its face and as applied during the election.  *Id.*  The district court granted the State's motion to dismiss, and on appeal the Eighth Circuit affirmed in part and reversed in part.  *Id.*  The Eighth Circuit determined that the district court improperly considered matters outside the pleading on the as-applied challenge.  *Id.*  On remand, the district court granted summary judgment on the as-applied challenge; the case was again appealed, and the Eighth Circuit affirmed.  *Id.*  The appeal to the U.S. Supreme Court followed.

The U.S. Supreme Court found that the political apparel ban implicated its "forum based" approach and noted that "'[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities.'"  *Id.* at 1885 (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800, 105 S.  Ct. 3439 (1985)).  And, citing *Lehman*, it stated that "the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy."  *Id.* at 1885-86.  The Court determined that the polling place was a nonpublic forum because it was set aside on election day "for the sole purpose of voting."  *Id.* at 1886.  It noted that the text of the apparel ban did not distinguish based on political persuasion or discriminate based on viewpoint on its face, so the question was whether the ban was reasonable in light of the purpose of the forum, which was voting.  *Id.*  The Court determined there was no "basis for rejecting Minnesota's determination

that some forms of advocacy should be excluded from the polling place, to set it aside as 'an island of calm in which voters can peacefully contemplate their choices.'" *Id.* at 1887 (quoting Mansky's brief). "The State may reasonably take steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most." *Id.* at 1888.

The problem with Minnesota's regulation was not that it attempted to restrict certain apparel but that the line it drew was not reasonable. *See id.* The Court felt the term "political" was "unmoored," and when this problem was combined with "haphazard interpretations [that] the State . . . provided in official guidance," the regulation failed "even this forgiving test." *Id.* The term "political" "can be expansive"—a button urging people to vote would qualify. *Id.* The State argued that the ban did not prohibit any conceivable political message and instead only those that would convey a message about electoral choices at issue. *Id.* at 1888-89. The Court, however, found that parts of the guidance that the State distributed to election judges to implement the statute for Election Day just raised more questions. *Id.* at 1889. It noted that one of the examples was "issue oriented material designed to influence or impact voting," and reasoned that a "rule whose fair enforcement requires an election judge to maintain a mental index of the platforms and positions of every candidate and party on the ballot is not reasonable." *Id.* Similarly, the example of items "promoting a group with recognizable political views" was problematic as "[a]ny number of associations, educational institutions, businesses, and religious organizations could have an opinion on an 'issue[] confronting voters in a given election.'" *Id.* at 1890.

The Court found that the indeterminate prohibition carried the opportunity for abuse and that any discretion vested in election judges to screen individuals "must be guided by objective, workable standards." *Id.* It held that "if a State wishes to set its polling places apart as areas free

of partisan discord, it must employ a more discernible approach than the one Minnesota has offered." *Id.* at 1891. While Minnesota had "sought to strike the balance" between the right to vote and the right to engage in political discourse "in a way that affords the voter the opportunity to exercise his civic duty in a setting removed from the clamor and din of electioneering," it had not supported these "good intentions with a law capable of reasoned application." *Id.* at 1892.

PETA contends that TAMU's prohibition of political advertising is indistinguishable from *Mansky* because TAMU's policy is incapable of reasoned application and confers unbridled discretion to censor speech. Dkt. 16. PETA asserts that the policy provides no workable standards for judging what it permits and what it prohibits. *Id.* The court agrees that this case is similar to *Mansky* in that both rely on how the political entity defines "political" and, though this terminology is not used in *Mansky*, both are about protecting a potentially unwilling and somewhat "captive audience" from the messaging.[2] They are different with regard to the physical type of forum, as *Mansky* did not involve public transportation.

Hinckley argues that "context is paramount in a nonpublic forum analysis—it is why *Lehman*, not *Mansky*, controls." Dkt. 21. The court agrees that *Lehman* is more closely analogous than *Mansky* with regard to the context of the forum. Hinckley asserts that, additionally, the policy here specifically narrows "political" with "viewpoint," and "avoids many of the line-drawing problems that plagued *Mansky*'s broad political apparel ban." *Id.* It is, however, difficult to determine how the addition of "viewpoint" narrows the question; even wearing a button that says "vote," while not embracing one party over the other, expresses a viewpoint that one should vote. This is arguably a "political viewpoint." It is also worth noting that in *Mansky* the State provided

---

[2] While the voters in *Mansky* are not forced to see political apparel while traveling on public transit, if they wish to exercise their right to vote and a person wearing political attire is right next to them, they are forced to see the message at a time when they may prefer not to be exposed to others' views.

guidelines for interpreting "political" that also attempted to narrow how the term was interpreted, and there do not appear to be similar guidelines to aid officials in applying "political viewpoint" here.

Without question both *Lehman* and *Mansky* are on point to some extent, and the *Mansky* opinion, while addressing nonpublic forums, does not provide clear guidance on how to reconcile its holding with its older public transit cases.  While the Fifth Circuit has not had an opportunity to weigh in post-*Mansky*, the court finds that some discussion of cases from other circuits that have considered *Mansky*'s impact on the free speech analysis for public transportation systems will be helpful.  These cases are persuasive authority.

### 3.    Post-*Mansky* Cases

The parties cite several circuit-level cases that have considered how *Mansky* impacts the First Amendment reasonableness analysis for issue- or politics-based advertising restrictions in public transit systems.  In *American Freedom Defense Initiative v. Washington Metropolitan Area Transit Authority*, 901 F.3d 356 (D.C. Cir. 2018), the D.C. Circuit considered the constitutionality of the Washington Metropolitan Area Transit Authority's ("WMTA") ban on "issue-oriented advertising," which included "political, religious and advocacy advertising."  The *American Freedom Defense Initiative* plaintiffs had proposed an advertisement for the exterior of Metrobuses and Metrorail station dioramas that allegedly made "'the point that the First Amendment will not yield to Sharia-adherent Islamists who want to enforce so-called blasphemy laws here in the United States . . . .'"  901 F.3d at 360 (quoting the plaintiffs).  The plaintiffs argued that WMTA's policy banning issue-oriented advertising was a content- and viewpoint-based restriction in violation of the First Amendment.  *Id.* at 361.  The district court granted summary judgment in favor of WMTA, holding that the restrictions were viewpoint neutral and reasonable.  *Id.*

On appeal, the D.C. Circuit determined that the advertising space was a nonpublic forum and the restrictions were viewpoint neutral.  *Id.* at 363.  However, it remanded to the district court to determine, in light of *Mansky*, "whether the restrictions [were] reasonable."  *Id.*  Specifically, the court found that *Mansky* added an additional inquiry to the First Amendment analysis: "whether the discretion vested in a government official to permit or prohibit speech is 'guided by objective, workable standards.'"  *Id.* at 372 (quoting *Mansky*, 138 S. Ct. at 1891).  It noted that if the guideline for applying the policy that was at issue was capable of reasoned application, "then it does not confer unbridled discretion" upon WMTA.  *Id.*  The district court was still considering the case on remand as of the time of the instant decision.

The Third Circuit and Sixth Circuit have also considered First Amendment on public transit cases post-*Mansky*.  In the Third Circuit case, *Center for Investigative Reporting v. Southeastern Pennsylvania Transportation Authority*, 975 F.3d 300 (2020), the plaintiff's proposed advertisement about research relating to racial disparities in the home mortgage lending market, which it sought to place inside of city buses, was rejected because it addressed "'a matter of public debate and litigation.'"  975 F.3d at 308.  The Southeastern Pennsylvania Transportation Authority ("SEPTA") had "Advertising Standards" that prohibited, among other things, advertisements that "express[ed] or advocat[ed] an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues."  *Id.*  The district court had a trial and issued findings of fact and conclusions of law.  *Id.* at 311.  It held that portions of SEPTA's challenged Advertising Standards "were incapable of reasoned application," and it struck what it considered to be the problematic parts and ordered SEPTA to revise its policy to be consistent with the court's holding.  *Id.* at 312.  The district court determined that with the language it had stricken removed, the facial and as-applied challenges failed.  *Id.*

On appeal, the plaintiff asserted that the challenged provisions, as modified by the district court, constituted an impermissible subject matter restriction (facial challenge) and discriminated against the plaintiff's viewpoint (as-applied challenge). *Id.* at 313. The Third Circuit determined that *Mansky*'s holding "that content-based restriction on speech in nonpublic fora are unconstitutional if they are incapable of reasoned application . . . squarely resolv[ed] the issues." *Id.* at 313 (citing *Manksy*, 138 S. Ct. at 1892). It noted that under *Mansky* "even if the content-based restriction is one that merely restricts certain subjects, as opposed to certain viewpoints, it must at the very least be capable of reasoned application." *Id.* at 314. The Third Circuit pointed out that the *Mansky* Court considered several factors including whether the terms of the statute were "'indeterminate'" and whether they were "susceptible to 'erratic application.'" *Id.* at 315 (citing *Mansky*, 138 S. Ct. at 1889, 1890). The Third Circuit did not ignore *Lehman*; it noted that *Lehman* demonstrates that "not all bans on political advertisements are unconstitutional." *Id.* The court ultimately held that "the lack of structure and clear policies governing the decision-making process [by SEPTA] creates a real risk that [the policy] may be arbitrarily applied" and the advertising standards were "incapable of reasoned application." *Id.* at 317.

The Sixth Circuit case that addressed advertising on public transit systems in the wake of *Mansky* is *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, 978 F.3d 481 (6th Cir. 2020). American Freedom Defense Initiative attempted to place an advertisement that said "Fatwa on your head? Is your family or community threatening you? Leaving Islam? Got Questions? Get Answers! RefugefromIslam.com" on Michigan's Suburban Mobility Authority for Regional Transportation ("SMART") buses. 978 F.3d at 485. SMART rejected the advertisement under two of its Advertising Guidelines, one that prohibited "political or political campaign advertising" and one that prohibited "advertising that is clearly

defamatory or likely to hold up to scorn or ridicule any person or group of persons." *Id.* at 486. During the litigation, the plaintiff attempted to run a different ad that said "Don't believe in Muhammad? You are not alone. TheTruthAboutMuhammad.com," and SMART rejected it because it deemed the content on the website (not the text of the ad itself) to be "political." *Id.* at 488. The Sixth Circuit addressed *Lehman*, noting that the U.S. Supreme Court "rejected a free-speech challenge" to the refusal "to display a political candidate's campaign materials" on a public transit system and that the *Lehman* Court rejected the notion that the transit system was a traditional public forum. *Id.* at 492 (citing *Lehman*, 418 U.S. at 299, 303–04 (plurality)).

The Sixth Circuit analyzed the *American Freedom Defense Initiative* case as if the advertising space were a nonpublic forum, without making the determination if it was a designated or nonpublic forum. *Id.* at 492–93. It found that "SMART's opaque definition of 'political' [was] unreasonable" and that SMART did not adopt a more discernible approach than the defendant in *Mansky*. *Id.* at 492–94. It noted that SMART's ban served "permissible" ends that were similar to those in *Lehman*—minimizing chances of abuse, the appearance of favoritism, and imposing on a captive audience. *Id.* (discussing *Lehman*, 419 U.S. at 303–04). However, the court found that under *Mansky* SMART must also "adopt 'objective, workable standards' to achieve its permissible ends." *Id.* (quoting *Mansky*, 138 S Ct. 1886). It thus determined that *Mansky* added these standards to the reasoning applied in *Lehman*. The court noted that SMART's restriction, like the restriction in *Mansky*, was an "'unmoored use of the term "political" with the same risk of "haphazard interpretations.""" *Id.* (quoting *Mansky*, 138 S. Ct. 1888). SMART had no source to define "political" or tell officials how to apply it.[3] *Id.*

---

[3] The court noted that SMART did not follow the broad dictionary meaning of "political" (the definition the parties in this case advocate for) because some of the advertisements it allowed, like voter drives, would not be allowed under that definition, and it did not follow the narrow dictionary definition for "political"—relates to a political campaign—because it had a separate section in the

The Sixth Circuit held that SMART was not using "workable standards" needed for a "'reasoned application'" of its ban.  *Id.* at 497 (quoting *Mansky*, 138 S. Ct. at 1891–92).  It noted that its pre-*Mansky* cases had interpreted Supreme Court "cases about nonpublic forums as allowing the government to draw 'fine lines' on a case-by-case basis" but *Mansky* "clarifie[d] that this reasonableness requirement for nonpublic forums has greater teeth and compels states to adopt 'a more discernible approach.'"  *Id.* (quoting *Mansky*, 138 S. Ct. at 1891).  In short, SMART's guidelines adopted "an amorphous ban on 'political' speech that cannot be objectively applied."  *Id.* at 498.

While the Fifth Circuit has not considered a similar case post-*Mansky*, these cases teach that the courts considering speech restrictions for bus advertisements are not simply looking at *Lehman* as binding authority for the proposition that it is not a First Amendment violation to prohibit "political" advertisements on buses.  Instead, courts are inquiring into the reasonableness of the particular ban and considering the standards by which the advertisements are reviewed.  They consider the *Mansky* Court's reasonableness review as an additional requirement or clarification.  These cases all had a factual record.

Here, Hinckley seeks a ruling at the motion to dismiss stage based on the premise that *Lehman* is directly on point and binding and has not been overruled.  However, the *Lehman* opinion was issued before the modern forum-based approach to First Amendment claims, the circuit courts considering similar bans on advertising on buses do not read *Lehman* as determinative and apply the guidance from *Mansky*, and there are many factors that distinguish this case and *Lehman*.  Thus, while helpful, *Lehman* does not dictate a ruling in favor of Hinckley at the motion to dismiss stage.

---

guidelines prohibiting political campaign advertisements.  *Id.* at 494–95.  SMART's initial reviewer testified that she used a "common sense" approach.  *Id.* at 495.

**B.      Viewpoint Discrimination**

Hinckley argues that TAMU's transit system is a nonpublic forum and TAMU therefore only has to show the policy is reasonable and viewpoint neutral.  Dkt. 10.  He asserts that the policy furthers the purpose of the TAMU transit system and evenhandedly prohibits all political campaigns and viewpoints.  *Id.*  He contends that TAMU's policy is reasonable for the same reasons the policy in *Lehman* was reasonable: (1) student, faculty, and visitors rely on the system to attend classes and campus events, and it is thus sensible to restrict messages on buses that students and other passengers have no choice but to use; and (2) it makes sense for TAMU to retain control over advertisements that might yield "lurking doubts about favoritism" contrary to its desire to maintain a neutral image.  *Id.* (relying on *Lehman*).  Hinckley asserts that the policy is viewpoint neutral because it evenly applies to all political advertisements.  *Id.*  He argues that PETA cannot prevail on its facial challenge because multiple courts have recognized that bans on political speech in public transit systems are constitutionally permissible, and it cannot prevail on its as-applied challenge because TAMU has not unconstitutionally applied its policy.  *Id.*  Specifically, with regard to the as-applied challenge, Hinckley points to the following definition of "political"—"of or relating to government, a government, or the conduct of government"—and argues that PETA advertisement was exactly the type that the policy prohibits because it concerns the conduct of TAMU's laboratory.  *Id.*  He asserts that an advertisement in favor of the laboratory would also be prohibited under the policy.  *Id.*  Finally, Hinckley argues that the policy does not give TAMU "unbridled discretion" as defined by the Fifth Circuit, which recently held that prior restraints on speech in nonpublic forums "'must contain neutral criteria sufficient to prevent (1) censorship that is unreasonable in light of the purpose served by the forum and (2) viewpoint-

based censorship.'" *Id.* (quoting *Freedom from Religion Found. v. Abbott*, 955 F.3d 417, 429 (5th Cir. 2020)).

PETA does not concede but assumes for the purposes of the motion to dismiss that the forum is nonpublic. Dkt. 16. It agrees that some courts upheld broad bans on political advertising before *Mansky* but argues that, post-*Mansky*, "that approach is not longer tenable." *Id.* (citing *Am. Freedom of Def. Initiative*, 978 F.3d at 493 (noting that the U.S. Supreme Court "clarified the reasonableness requirement" in *Mansky*)). It argues that TAMU's policy is not capable of reasoned application because TAMU deploys "political" in its broadest sense. *Id.* It contends that the clarifications offered in TAMU's moving papers, including the definition of "political," are "just as amorphous as the ban itself." *Id.* (noting that the *Mansky* Court found that using the definition of "political" as an attempt to limit application of a speech ban invalid). It argues that "an empty word or phrase cannot be filled with equally empty standards." *Id.* It points out that one possible reading of the phrase: "contain[] political campaigns and viewpoints or endorsements" is that electioneering advertisements, like the one in *Lehman*, are prohibited, but that TAMU "apparently reads the prohibition to sweep within it any issue advertisement, even if not related to a political campaign." *Id.*

PETA indicates that it believes discovery will reveal that the prohibition has been applied haphazardly given its ambiguous interpretation and that the court will find that the political speech prohibition is unconstitutional because it is not capable of reasoned application. *Id.* With regard to *Lehman*, PETA asserts it does not control because (1) it predates modern forum analysis because the test applied is not the modern test for reasonableness in a nonpublic forum; and (2) *Lehman* dealt with a far more proscribed "political" advertisement prohibition that was limited to direct political candidate advertising. *Id.* PETA additionally asserts that even if the court were to

determine that the policy is facially valid under *Lehman*, the court must deny the motion to dismiss and allow discovery because PETA has plausibly stated a claim of viewpoint discrimination. *Id.* It notes that viewpoint analysis typically involves evidence of advertisements that the systems have run, making it inappropriate to resolve prior to discovery. *Id.* It further notes that the fact that TAMU diverted its regular review process in this case, sent the ad to the VP of Brand Development for review, and took six weeks to decide to reject the ad, is strong circumstantial evidence that TAMU discriminated based on PETA's viewpoint. *Id.*

In reply, Hinckley notes that the allegations about his review of the advertisement are consistent with the presumption that TAMU does not normally receive advertisements like PETA's and that since it was a closer call it needed to be elevated to a higher-up official. Dkt. 21. He does not, however, point to any caselaw indicating that the court should make such a presumption. *See id.*

Since PETA concedes for the purposes of this motion that the TAMU transit system is a nonpublic forum, the court must simply determine if PETA has plausibly stated a claim that the policy is not reasonable or is an effort to suppress expression merely because Hinckley opposed PETA's views about the TAMU muscular dystrophy laboratory. While restriction of political advertisement on public transit systems has traditionally been permitted under *Lehman*, *Mansky* expanded on what is needed for a "reasonable" restriction on bans of "political" speech and teaches that such bans must be capable of reasoned application. Here, it is plausible that absent any guidance to officials on what TAMU means by "political campaigns and viewpoints or endorsements," that the restriction is not capable of reasoned application. Moreover, it is plausible that it was an unconstitutional ban on PETA's viewpoint as applied.

C.     **Vague**

Hinckley moves to dismiss PETA's second cause of action—that the policy is unconstitutionally vague—because the allegations in the complaint do not rise to the "high hurdle for a constitutional vagueness challenge."  Dkt. 10.  He contends that the doctrine does not apply because the policy does not threaten PETA with a sanction for using protected speech and thus does not deter speech, and he argues that even if the doctrine did apply, PETA fails to state a plausible claim because "'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity.'"  *Id.* (quoting *Mansky*, 138 S. Ct. at 1891 (additional quotations omitted)).  Instead, Hinkley argues, TAMU must only provide a reasonable degree of certainty as to the policy's scope, and it has met that standard given the "easiliy accessible definitions of the word 'political' . . . [and] the linkage in the policy between the words 'political' and 'campaigns' and 'viewpoints.'"  *Id.*

PETA contends the political advertisement prohibition is void for vagueness under the Due Process Clause because it is "incomprehensible in text and in practice."  Dkt. 16.  The restriction does not define "political" and does not state how to determine if an advertisement is "political."  *Id.*  Moreover, PETA asserts a person of ordinary intelligence could not consistently apply the ban or anticipate what is prohibited.  *Id.*

"In evaluating vagueness, a reviewing court should consider: (1) whether the law 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly'; and (2) whether the law provides explicit standards for those applying them to avoid arbitrary and discriminatory applications."  *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 551 (5th Cir. 2008) (quoting *Graynard v. City of Rockford*, 408 U.S. 104, 108–09, 92 S. Ct. 2294 (1972)).  The court must not apply these standards mechanically.  *Id.* (citing *Vill. of*

*Hoffman Ests.*, 455 U.S. at 498).  However, "[w]here a statute's literal scope . . . is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts."  *Goguen*, 415 U.S. at 573.

The court finds that PETA has plausibly stated a claim that TAMU's restriction is unconstitutionally vague.  Even at this early stage of the litigation, the restriction of advertisements for "political campaigns and viewpoints or endorsements" is plausibly confusing to a person of ordinary intelligence without having further guidance.  The term "political" itself has multiple definitions, including (1)(a) "of or relating to government, a government, or the conduct of government"; (1)(b) "of, relating to, or concerned with the making as distinguished from the administration of governmental policy"; (2) "of, relating, involving, or involved in politics and especially party politics"; (3) "organized in governmental terms"; and (4) "involving or charged or concerned with acts against a government or a political system."  *Political*, *Merriam-Webster Dictionary*,  https://www.merriam-webster.com/dictionary/political  (last visited Mar. 1, 2021). While a reasonable person may believe the policy restricts advertisements that express viewpoints either in favor or against TAMU or advertisements that somehow endorse TAMU, since TAMU could be considered "government," if the same person were to apply the "of, relating to, involved in politics and especially party politics" definition, that person may make a completely different decision.  At least at this stage, there is no indication there are standards provided to clarify what the restriction means.  The court finds that the claim therefore is plausible.

**D.      Overbroad**

Hinckley moves to dismiss the claim that the policy is overbroad under the First and Fourteenth Amendments because overbreadth should only be employed as a last resort.  Dkt. 10. It argues that this claim fails because the policy covers political campaigns and viewpoints in a

manner consistent with the purpose of the forum and does not criminalize any activity.  *Id.*  The policy also does not, according to Hinckley, restrict protected expressive activity in light of the nonpublic nature of the forum.  *Id.*  Hinckley argues that *Lehman* compels the rejection of any argument that the TAMU buses are anything other than a nonpublic forum.  Dkt. 10.

PETA argues first that the court need not reach the overbreadth analysis because the advertisement is unconstitutional facially and as applied.  Dkt. 16.  However, if the court were to reach it, PETA urges that it would be overbroad "because TAMU reads its own regulation to cover apparently any issue on which people can disagree, or any advertisement designed to persuade viewers on social, economic, cultural, or other issues, a substantial number of the ban's applications clearly are unconstitutional."  *Id.*  It contends that the ban "sweeps within it literally all other speech covered and protected at the core of the First Amendment."  *Id.*

The court finds that it is improper to reach the overbreadth challenge at this point since it is only considered as a last resort, except to find that it is plausible that, should the court have reason to reach the overbroad challenge at the motion for summary judgment stage, PETA could show a substantial number of the applications of the policy are unconstitutional, judged in relation to the policy's plainly legitimate sweep.  This will depend on the evidence obtained in discovery, and PETA has sufficiently stated a claim to be allowed discovery into what types of advertisements TAMU has approved and rejected under the policy.

### IV. CONCLUSION

Hinckley's motion to dismiss is DENIED.

Signed at Houston, Texas on March 15, 2021.

Gray H. Miller
Senior United States District Judge